Go right ahead. Good morning, Your Honors. Jennifer Bennett for the appellant Elisa Romero. There are three questions at issue in this appeal. The first, whether a person who receives unwanted robocalls has standing to challenge them under the Telephone Consumer Protection Act has been effectively resolved by this Court's decision in Van Patten. So unless this Court has questions on that issue, I plan to focus my time on the other two questions in this appeal. The first of those two questions is whether the Rosenthal Act permits debt collectors to violate the statute with impunity so long as they stop violating the law if they get sued. And the second question is whether California law prohibits a cause of action for invasion of privacy based on hounding someone with unwanted calls, despite the fact that California law has adopted the second restatement of torts on this issue and that restatement says otherwise. The answer to both of these questions is no. Well, counsel, let me just ask. The banks in this case assert that your client solicited the phone calls. Did your client solicit them? How at all does this affect your standing to pursue your TCPA claim? Sure. So the — I believe that argument is based on the fact that in her application for a credit card, she gave them her home phone number and at some point later gave them her cell phone number, which is where these calls were. But this case, the Court's decision in Van Patten and the FCC rules are clear that you can revoke your consent under the TCPA, and there's evidence in the record that she did that. So at ER 75 is her declaration telling — which says that she told them to stop calling on July 2nd, which is before the vast majority of the calls were made. Only one call was made before then. So the suit is about the hundreds of calls that were made after then. So you're not seeking damages for the earlier calls prior to her consent? That's correct. We're not seeking damages for the one call that happened before she revoked consent. That's correct. I think 294 of the calls happened after that. I think it's a little trickier because I think at ER 81, opposing parties' version of stopping was to stop for five days, right, when she revoked her consent, that the policy was, okay, we won't call for five days. That's correct. That's what they said. But the TCPA says you can never call. Robocalls are never permitted once consent has been revoked, and she didn't grant consent again later. She revoked consent and then never, never again permitted them to call. So under the TCPA, that would be a violation. Going to the Rosenthal Act, as we stated in our response to the bank's 28-J letter, although we disagree with the decision in Afawerki, we recognize that it forecloses our argument that the cure provision of the Rosenthal Act does not apply. But that doesn't change the outcome in this case because the banks didn't and couldn't possibly cure their violation of the Act, which is that they called Ms. Romero hundreds of times against her will. So what the banks argue — Excuse me, counsel. What is an example of a curable violation — Sure. — versus an incurable? How can you cure a past call? So I would say a past call is an incurable violation for exactly this reason. It is a historical fact that's over and done with, and they can't possibly undo the harm that's caused. The violation in Afawerki is a good example of a curable violation. So in that case, there was a mistake in a complaint, a relatively minor mistake about the amount of the debt in the complaint. And once they realized the mistake, they corrected the amount and no harm was done. So that's a curable violation. And the Rosenthal Act prohibits a lot of these kinds of misstatements violations, things that you can imagine would be easily corrected without anything happening. The Rosenthal Act also prohibits things like using violence to collect a debt, so punching someone in the face to try to get them to pay you, or things like unwanted telephone calls. And these things are things that cause harm that you can't go back and undo later. And so that's what's incurable. Well, what you're saying makes sense. I just wonder, is there any authority for it? Sure. Have California courts really talked about what is or is not incurable within the meaning of the safe harbor provision? Not within, not for this statute. So there is another California statute, the Open Meetings Act statute, that also has a cure provision. And the California Court of Appeal in a case called Page took a look at that statute, and the argument was if we violate the open meetings provision, if we don't have open meetings but we later, we don't do it again, once you tell us we're violating it, we then go back and have open meetings, we've cured the violation. And what the California Court of Appeal said is no, you can't just cure the violation by stopping your closed meetings. You have to go back and undo whatever the harm was caused by not having open meetings in the first place. And similarly, in terms of this, there's another California, it's a proposition I believe, that has a requirement that before you sue under it, you have to inform the government, and they have to have an opportunity to intervene. And there's a case called Physicians Committee for Responsible Medicine. And in that case, the plaintiffs did not inform the government properly, and they said, well, we can cure it because now we've notified the government. And what the court said is no, that's not a cure because the harm has already been done. The government can't now go back and try to stop this lawsuit. And so those two cases demonstrate under California law that the courts have interpreted the word cure to mean undoing the harm caused. You mean unringing the bell, truly being able to turn back. Exactly. So in this case, the safe harbor provision has no application? That's correct. In this case, because the safe harbor provision is explicit, it says you can cure violations that are able to be cured, which means that the legislature recognized in passing the law that some violations would not be able to be cured. And this is an example of one of those violations. And that makes a lot of sense given the purpose of the Rosenthal Act, which is to protect consumers from abusive debt collection. So if you have violations, for example, misstatements is a good example, where you can go back and correct them and not cause harm, then it makes sense that the legislature might want those to be curable. They might want to give banks and debt collectors an opportunity to fix those mistakes. Whereas violations that would cause harm that you can't go back and undo, it makes sense that the legislature would want to keep damages remedies for those kinds of violations and prevent them from happening. Well, since there's no California case directly on point, although you've mentioned the two cases, would it make any sense to certify this question to the California Supreme Court? It's certainly one possibility. This meaning of the word cure is pretty universal in terms of a legal violation, so we think that it's pretty clear what the California courts would do, but it's certainly an option. Thank you. And then the second issue that I want to discuss is briefly touch on the invasion of privacy question. So the bank's argument is that as a matter of law, there's no amount of unwanted calls that could constitute an invasion of privacy under California law. But California has adopted the second restatement of torts, which specifically says that there's liability for hounding someone with unwanted calls. And that's exactly what happened here. The banks called Ms. Romero hundreds of times against her will. They often called her many times a day. They called her after she repeatedly told them to stop. They were interrupting her conversations, disrupting her from what she was doing. And a reasonable person could certainly find that these calls constituted an invasion of privacy. And in fact, several reasonable people have. Judges across the country applying the standard have said that this kind of claim has to go to a jury. Both Congress and the California legislature have passed laws prohibiting these kinds of calls. And these kinds of legislation, legislation saying that particular conduct is an invasion of privacy, is a factor that the California Supreme Court has considered in determining whether conduct is an invasion of privacy. That's the Shulman case, for example. So it just can't be that no matter how many times somebody calls you against your will, that that's not an invasion of privacy. That's just not what the restatement says. The restatement says one or two or three times isn't an invasion of privacy. This is well above that. And so it's up to a jury to decide whether hundreds of calls well above the few calls that the restatement excludes in this case would constitute an invasion of privacy. The district court viewed this as a series of one phone call. Correct. Was that argument advanced by the banks below? I actually do not know the answer to that question. I don't remember in their briefing whether that was an argument that the district court itself... Have any other courts treated these violations that way and viewed them as a series of single phone calls? There are a few courts for purposes of standing that have, under the TCPA, that have done that. They have, I believe all of them, though, have still upheld standing. That might not be true. Maybe a few citing the district court in this case have not. But in any case, if you're asking for the purpose of standing... No, I'm not asking for standing. You've got Van Patten. I'm asking for the purpose of the tort. Oh, for the purpose of the tort. I don't know of any case that has looked at, for the purpose of invasion of privacy, tort as looked at a single call in isolation. And that wouldn't make sense in terms of what the restatement says, which is to say you look at the course of calls. I had a narrower question. Has anybody ever done that? Not to my knowledge. Thank you. Sure. If there are no further questions, I'll reserve the remainder of my time for rebuttal. It looks like there are not. Thank you. Thank you. Good morning, Your Honors, and may it please the Court. My name is Chad Silker. I represent the Appellees Department Stores National Bank, who is the issuer of the Macy's credit card, for which Ms. Romero became delinquent, and FDS Bank, which is the servicer of that same credit card. May I just ask, is there any evidence in the record that Romero solicited these calls? Yes, Your Honor, there is. She updated her phone number, called in just a few months before she became delinquent on this account. And, of course, there's a certain period of time before the delinquency takes effect, of course, after a bill. She updated her number to provide this cell phone number specifically to the banks very shortly before she became delinquent on the account. Didn't she specifically tell the banks she didn't want to receive these calls? I think that point is in dispute. The record from her own mouth is a bit in dispute. She says, I don't have the money to pay it. She says, please stop calling because I don't have money. She didn't. If you look at it in a TCPA context of what is a revocation, you know, the TCPA says that the FCC says that that has to be a clear expression of the revocation. And her statement was, I don't have money. Please stop paying, which puts it in the context of the collections and the bank's rights to collect on the account, because she's unable to pay at this moment, but those circumstances could change, and not that she doesn't want to receive calls at all. One last question. Excuse me. Go ahead. Well, could we just put a response to Judge Nelson's question before we go on, if I may? She asked a different question, and it's an important question. What you're saying is that her revocation wasn't equivocal and endless, as in I don't have money right now. Maybe she would next week. But Judge Nelson asked, what evidence is there that she solicited the calls? And all you've got, I think, is that she updated her phone number. But is there anything more? I believe that the providing her phone number is a solicitation of calls. I mean, of course ---- Counsel, is the answer to my question no, there's nothing more? I believe that's all, yes. Okay. All right. Now, speaking of the TCPA, do you agree with what Ms. Bennett said, that Van Patten resolves the TCPA issue in this case? Certainly, I think Van Patten takes a step forward. I think there's a distinction that the trial court made and has made in subsequent rulings that ---- Is that a no? I do not agree with her, because I think there's a distinction between telemarketing and the collection calls. And, of course, the collection calls ---- Contesting standing. I'm sorry. Are we still contesting standing? That's what Judge Fatim is asking. Yes. Yes, we are still at this time contesting standing. The ---- If you are still contesting standing, what about the Van Patten case? Certainly, I understand the Van Patten case. I think it's distinguishable because of the distinction between telemarketing and collection calls. And I think that the holding was narrow there, and, of course, the Court may disagree as it applies to these facts. But I do think that if you look at the congressional history, the legislative history for the TCPA, the focus was on telemarketing and the scourge of receiving telemarketing calls. These are not telemarketing calls that were made. It may be a point without distinction, ultimately, I understand. But certainly, at least in the trial court's view, that was a distinction of much importance to her. I grant you it's a distinction. I think it's an important distinction, that there was a creditor-debtor relationship here, and she owed the money. And that doesn't seem to be disputed. But she also said, please stop calling. And it sounds to me like, if I'm understanding correctly, going to the safe harbor provision, but your definition of ceasing in response to her request that they stop was to stop for five days. Is that right? ER-81. I'm at ER-81. And my understanding is that that's what that says. And the practice where there's an indication that the debtor was unable to make a payment, the practice was to stop for five days. Of course, subsequent to this, there's been more guidance from the FCC about what about revocation. Okay. So today, is your position that your client is entitled to take advantage of the safe harbor provision because it cured by stopping for five days? Actually, no, it is not. The distinction is because we cured when we received written notice of the rosin cell violation. The statute reads that within 15 days of written notice of a violation, if acts are taken to correct or to adjust that violation. Okay. So that's the service of the complaint? Correct. That was the first written notice. And at that point, you stopped and you stopped for more than five days? Correct. In fact, actually, we had previously to that already stopped calls upon what was a clear expression of a revocation of consent. That actually happened about two months before the service of the complaint, all calls were ceased. So what was different about that revocation? There was a clear intent expressed by the debtor of stopping all calls, not linked to whether the ability to pay, but a clear intention to stop calls. And, of course, at that point, I think it's much in dispute. The call records from the previous two calls where she claims that she said something and her comments where I told them I'm unable to pay, so please stop calling. That information is not reflected. And, of course, it's not reflected in the record from the call records and the information generated from those phone calls. So the collectors testified that they would have recorded that had that information, that request, been made. Is that a dispute of fact, then, about whether her revocation of consent was equivocal? The trial court found that there was no dispute there. I think based on her own inconsistencies. And I'm asking you. Why wouldn't that be a dispute of fact, counsel? Yes, it very well could be. Really tough. I'm having a hard time getting answers to my questions. What's your position? What's your position? Is it a dispute of fact? Yes. I think it is a dispute of fact given on her own testimony. She has her own consistencies, inconsistencies in her testimony. And the trial court looked at that and said it's not color. She hasn't made a colorable allegation of revocation of those two calls. Plaintiff also disputes, I believe, whether or not at least the Rosenthal violations were curable violations, right? So that goes back to, I guess, you have different definitions of what cure means. What's your definition of cure? And why was your violation a curable violation? Thank you, Your Honor. Our definition of cure, and I think the statute, the first in the ordinary course and ordinary meaning of the word cure, supported by the statute itself, is to fix the underlying issue, fix the conduct. And that was done by stopping the calls. The statute refers to corrections. Wait, wait, wait. Excuse me for interrupting. But to be clear, now you're talking about stopping the calls for five days. No. I'm talking about stopping calls from the point of receiving written notice. Okay. All right. There was no call from the written notice. That's the first time you're claiming cure. Yes. Correct. That was the cure. The cure occurred upon the receipt of written notice and within 15 days of that notice. Okay. So then getting back to Judge Cusima's question, because now I'm following you, I think you're saying that by stopping at that point you cured the, it had been a couple hundred phone calls. Is that? Correct. The statute refers to making a correction or adjustment to cure the violation. It focuses on the defendant's conduct, not on the result of the conduct. And I think that's a common premise within a safe harbor like this. The statute is, this particular provision in the statute is intended to provide a safe harbor for a collector from any liability under the statute. And that applies here, and the trial court looked at it and said, yes, that applies here where the call ceased upon written notice. You know, just in the usual use of the term cure, there's also, it's an antonym, incurable. In other words, some things are not curable. I mean, under your definition of cure, everything is, anything is curable. Is that right? There's no such thing as an incurable violation, which I think Plains needs to be arguing this is. I think there could be an incurable violation. One of those, an example, I think, looking at the statute, would be the statute has a provision that bars deadbeat lists, so basically the publication of lists of debtors. Once you put something, if you put it in the local newspaper, publish it for all to see, that's an example of something that would be incurable. You can't walk that back.  Because if I were to post it outside my door one morning and 10 minutes later take it off, a deadbeat list, these people owe me money, then I would have cured that. It wouldn't have had a publication to the world that would be difficult to cure. Well, if you receive 10 calls in one day, how can you possibly cure the harm that this has caused the person that had to run to the phone all during the day? It's done. The fact that you're not going to do it in the future is wonderful, but what about the past? And I think that the statute, the way the word cure is used in the statute refers to correcting or adjusting, and so it doesn't focus on whatever alleged harm there might be. Focusing on adjusting, that part of the statute? It's focusing on adjusting the conduct of the defendant to provide them a relief, a safe harbor where there is no liability for fixing their behavior, as opposed to providing relief to the debtor. There are other statutes that the debtor may have a claim on, but it just wouldn't fall within the Rosenthal claim. Counsel, could you answer the question I asked earlier about the tort claims and whether or not it was your client's position that they should be properly viewed as a series of single phone calls? In the lower, no. We did not make an argument that they should be, and I think particularly you're referring, Your Honor, to the intrusion upon seclusion claim. I am. And that argument was not one that was expressed. It was looked at as was this behavior, was there something more? And the trial court said when they're making a volume, a call volume argument, there must be something more. And the evidence is there was not anything more. There wasn't any threat. There were no threats. There were no calling of family members, late-night calls, things like that, that other courts have said constitutes the something more. All of this is, of course, being looked at with the — we're mindful that the district court did not have the benefit of Van Patten, so slightly different landscape now, but is there anything further? If there are no further questions to the Court, no. Thank you very much. I think we're good. Thank you, counsel, for your argument. Counsel, you have a little time left on the clock. I just want to address a few points that came up in the Banks argument. The first is the evidence in the record on revocation, and that's a disputed issue of fact. And I can point you to the ER sites for the revocation. Her declaration is at 75. It also — there's also evidence that it's in her declaration and in her notes that — and in the call records, I believe, that the reason they stopped calling was eventually — it was actually not because of her final revocation, but because she finally told them, this is the wrong number. Stop calling me. And that's the only reason they stopped calling is because they put a note in the record that it was the wrong number, not even because she had told them to stop calling. And previous to that, we have her notes in her declaration saying that she told them to stop. There's also a recording of the third call on which she says, please stop calling me and don't you have it in your records that I've told you to stop calling before, indicating — so there's more than just her say-so. There's also a recording where she's telling the bank representative, I've told you this before. So she owed them a debt, though. She owed them a debt. And she was saying, I don't have money now yet. And that's his response. And that didn't mean — Sure. And that's — it's disputed. So, Counsel, I was just trying to get to my question. I'm sorry. Let me finish, please. So his response is, she owes us money, and she's telling us she doesn't have money right now. She can't afford to pay right now. What's wrong with calling next week? That's his response. Did she give him — did she give them other ways to contact her to collect the debt? So she gave — I mean, so there are lots of ways you can collect a debt. You could send a letter. My counsel is really — this is a specific question. I know that there's lots of ways to collect a debt. I'm asking you whether she gave them other contact information. So I believe they had her address, although I'm not 100 percent sure of that. But I believe they would have had her address. And to the point of she told them, I don't have money right now, that's actually disputed what she told exactly the words were and whether or not that's a clear revocation. So on summary judgment, that would have to be a disputed issue, a fact that would go to the jury. So — and the second point I just want to touch on briefly is this idea that there's a distinction between telemarketing and debt collection calls. And what Van Patten says is that unsolicited contact is a concrete harm. And that's clear in the Telephone Communications Protection Act — Consumer Protection Act, rather. We go by what the text of the statute says, and the text of the statute — But you're not really engaging with his argument. His argument is it's different because he's not trying to sell you a blender, right, that was solicited because she has a debtor-creditor relationship and she had given the phone number. What's your response to that, please? The response to that is that she revoked her — to the extent that she consented, she revoked it, and she did so explicitly and repeatedly. And what Congress found in the findings are unwanted robocalls are a concrete harm, no matter the content of the call, no matter who is calling. And so once she revoked her consent, those were unwanted calls, and that's a harm. And that's — there's a long history, right, in the common law of these kinds of harms, invasion of privacy, nuisance. So even without the Telephone Consumer Protection Act, there still would be a concrete harm here sufficient for standing. What do you do with opposing counsel's argument that they didn't necessarily have to cure, but just make an adjustment? So the statute — I'll go to the text of the cure provision, which says, after discovering a violation which is able to be cured, if the debtor then makes whatever adjustments or corrections are necessary to cure it, then they escape liability. So the fact that it says — it says you can make adjustments or corrections to cure violations that are able to be cured. So it doesn't help — it doesn't support the position that all violations are able to be cured or that it means to stop the violation. It just says whatever violations you can cure through adjustments or corrections, then you may do so. And I think that use of the terms adjustments or corrections actually support the argument that certain violations can't be cured, things like violence, things like harassing someone with unwanted phone calls, because the things you think of as being able to adjust or correct are things like misstatements in a complaint or a letter. You can't make any adjustments or corrections that would undo the fact that you called someone hundreds of times against their will or punched them in the face in an attempt to collect a debt. So those are still harms that cannot be undone, regardless of whatever adjustments or corrections you make. If there are no further questions. I'm sorry. Yes, sir. Tell me one more time an example of a harm that can be undone. So, for example, if in the Afflewerkey case there was a minor misstatement in the amount of the debt, and then they went back once they figured out the mistake and amended the complaint and said to have the correct amount, and nothing bad happened from that. Or if you sent a letter with a misstatement that said, you know, I'm an attorney, for example, or I'm represented by an attorney, and nothing happens as a result of that letter, you realize it's a mistake, and you go back and send a new letter that says, I accidentally said that I was an attorney, but I'm not, and nothing bad has happened. Then you've cured it, you've corrected it, because there's no harm that's resulted from that, and you've changed the mistake. In that case, was there any allegation that there was emotional distress or harassment as a result of the misstated amount? There was not, as far as I know. It's certainly not an inch into the opinion. Well, if there were, would that make it incurable? If there were, it would be a closer question. I think it would probably make it incurable, because then you couldn't undo the harm. But it is, you know, it's not the issue here. I mean, I think there are certain violations that can never be cured, and I think those are things like violence, things like harassing phone calls, and that's as far as this Court needs to go today. Nothing further? Nothing further. Thank you very much. Thank you for your argument. That concludes our arguments for today. We'll stand and recess.
judges: D.W. Nelson, Tashima, Christen